UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**JIMMY DELL BOWEN,**

    **Plaintiff,**

v.                                      Case No. 8:17-cv-1242-T-35JSS

**DAVID A. GEE,**
**NAPHCARE MEDICAL,**
**KATHERINE TARICA,**
**DR. BALL,**
**DR. KALLMAN,**
**DR. TOOTLE, and**
**SERGEANT HAZEL,**

    **Defendants.**
_____/

## ORDER

This cause comes before the Court on a Motion for Final Summary Judgment filed by the remaining defendants in this case: NaphCare Medical, Dr. Frederico Kallman, Dr. Kristin Ball, and Dr. Karen Tootle ("the medical defendants").[1] (Docs. 88 and 89) Plaintiff Jimmy Dell Bowen, who is proceeding *pro se*, responded in opposition to the motion, and the medical defendants replied. (Docs. 100 and 103)

Preliminarily, Bowen moves the Court to construe his response in opposition to the summary judgment motion as a collective response that "appl[ies] equally to all defendants." (Doc. 101) The medical defendants jointly moved for summary judgment in a single motion, and they have not opposed Bowen's request. Accordingly, Bowen's "Motion for Joinder"

---

[1] No claims remain pending against Defendant Katherine Tarica because she was not a named defendant in the Amended Complaint on which this case now proceeds. (Doc. 8) In prior orders, the Court dismissed Defendant David A. Gee from this case, and ruled that Defendant Sergeant Kim Hazel was entitled to summary judgment in her favor. (Docs. 28 and 90)

(Doc. 101) is **GRANTED IN PART** as to the medical defendants. The motion is **DENIED IN PART** as to Defendants Gee and Hazel because the claims against them have already been resolved.

I.  Background

Bowen initiated this 42 U.S.C. § 1983 suit, alleging that the medical care he received while confined at the Hillsborough County Jail violated his Sixth, Eighth, and Fourteenth Amendments. Bowen proceeds on his Amended Complaint. The basis for Bowen's action is the alleged deliberate indifference to his serious medical need, specifically, the need for surgery to repair a hernia, and the alleged conditions inside an isolation cell. Bowen alleges that NaphCare, the entity that provides health care in the Hillsborough County Jail, refused for 22 months (from when he was incarcerated to the filing of the lawsuit) to schedule hernia repair surgery "due to cost to NaphCare." (Doc. 8 at 7) Bowen further alleges that he was placed in an isolation cell without a bed for seven days, during which time he had to sleep on a "boat" six inches off the floor. (*Id.* at 8) He alleges that the strain of getting up from the "boat" caused his hernia to tear further, "enlarging it to twice [its] original size causing continued extreme pain." (*Id.*)

Bowen began his incarceration at the Hillsborough County Jail on August 26, 2015, at which time NaphCare was the provider of medical services and Dr. Kallman was the Medical Director. On that date, a NaphCare medical provider examined Bowen and noted that he had a large, right inguinal hernia and was wearing a hernia belt. (Doc. 72-1 at 30)[2] Bowen reported that he had a hernia repair surgery two years prior. (*Id.* at 6) Bowen's

---

[2] For consistency, the Court cites to the pagination shown on the electronic docket, rather than the varying pagination the parties used in their filings.

2

medical records show that, in August and September of 2015, Bowen received routine medical care unrelated to this suit from NaphCare medical providers. (*Id.* at 25–30)

On September 29, 2015, NaphCare medical providers evaluated Bowen's hernia. (Doc. 72-1 at 32) During this examination, Bowen reported his previous, unsuccessful hernia surgery, but did not voice any hernia-related pain. Upon examination, the medical providers found the hernia to be approximately "4 x 4 inch[es]" and "reducible." (*Id.* at 32, 34) Bowen was instructed to continue wearing the hernia belt for support as tolerated. (*Id.* at 38) After this evaluation, Bowen continued to receive routine medical care for reasons unrelated to this litigation.

On October 29, 2015, Bowen completed a Sick Call Request form, complaining "the hernia belt you gave me is too small." (Doc. 72-1 at 40) On November 4, 2015, Bowen presented to NaphCare medical providers requesting a larger hernia belt. (*Id.* at 25 and 43) Bowen was advised that a larger belt would be ordered. (*Id.*)

On February 3, 2016, Bowen was seen by NaphCare providers for a routine three-month follow up and test results. (Doc. 72-1 at 50) Bowen did not complain of hernia pain or enlargement, but he requested "help to obtain a bond reduction so he can go out and fix his hernia through his Humana insurance." (*Id.*) Bowen informed the medical provider that "there was nothing wrong with the hernia support belt" and he was able to "keep [his] hernia reduced while wearing the support [belt]." (*Id.*) Upon examination, the hernia was "stable." (*Id.* at 54) Bowen was "reassur[ed]" that hernia surgery was "not an emergency at this point," but that it would continue to be monitored. (*Id.* at 56) He was advised to "avoid straining, pulling, pushing, etc.," was encouraged to use the hernia belt daily, and was "advised to discuss bond reduction issues with his attorney." (*Id.*)

3

On February 16, 2016, Bowen submitted a "Health Care Grievance" in which he wrote "consider this my second grievance to repair abdominal hernia." (Doc. 8 at 14) On March 3, 2016, Bowen submitted another grievance in which he wrote "this complaint concerns your failure to schedule me for surgery to repair abdominal hernia. Your failure to address this serious medical need can only result in my filing a civil rights complaint against you and NaphCare." (*Id.* at 15)

On May 2, 2016, during a medical examination, Bowen reported that his hernia was unchanged, and upon examination, the hernia was found to be "reducible" and "unchanged since [his] last evaluation." (Doc. 72-1 at 59 and 61) On May 25, 2016, Bowen completed another Sick Call Request, complaining of a possible stomach virus and persistent diarrhea. (*Id.* at 66) He was evaluated and treated by Dr. Kristin Ball. (Doc. 71-2 at 3) Bowen was placed in an isolation cell in order to rule out the possibility that he was contagious from a bacterial infection. (*Id*. and Doc. 72-1 at 68)

From May 25th until at least May 31st, Bowen remained in the isolation cell and was continually monitored, approximately 18 times. (Doc. 72-1 at 17–22 and 70) Bowen's medical records show that, while in isolation, he was found to be in no acute distress and was resting comfortably. (*Id*. at 17–22) On one occasion, Bowen complained of "back discomfort due to 'uncomfortable bunk.'" (*Id.* at 21) On May 28th, Bowen told a NaphCare medical provider the "long story about having hernia surgery when in prison at Jackson Memorial and 'got gangrene and 3 strains of alpha beta hemolytic strep into [his] scrotum[,]'" but made no complaints of hernia-related pain at that time. (*Id.* at 19)

On May 31, 2016, Bowen complained his hernia was causing him "a lot of pain." The medical provider noted that, upon examination, the hernia showed "no signs of incarceration

4

or strangulation." (Doc 72-1 at 17–18) The medical provider determined that it was "highly unlikely" that Bowen had a bacterial infection and could be released from isolation. (*Id.*)

The record is unclear whether Bowen was, in fact, released from isolation on that date. The record contains a "Medical Change of Status Form" dated May 31, 2016, which states "d/c" (presumably, "discontinue") contact isolation. (Doc. 72-1 at 70) However, NaphCare medical providers noted as late as June 9th that Bowen was "was cleared" from isolation and that it was "okay to transfer" to the medical pod. (*Id.* at 15)

On June 6, 2016, Bowen, who was visibly angry, complained to a NaphCare provider about a "hiatal hernia in [his] esophagus that he needs surgery for and he has insurance to pay for this." (Doc. 72-1 at 16) He also recounted his "extensive surgical history with this issue," including that he had "gangrene in [his] scrotum." (*Id.*) The record is unclear whether Bowen was referring to his right abdominal hernia or a different hernia located in his esophagus.

On June 8, 2016, Bowen was examined again by a NaphCare provider along with Dr. Frederico Kallman. (Doc. 72-1 at 15–16) Bowen again recounted his surgical history, reported that the "hernia was never fixed," and "request[ed] immediate surgical intervention due to increase[d] discomfort." (*Id.*) Bowen reported "increased pain around his right groin" but that he was "not [in] any acute distress." (*Id.*) Dr. Kallman's notes confirmed that Bowen "[did] not present with any signs of acute distress." The plan, as reflected in the progress notes, was to "explore the possibility of surgical intervention." (*Id.*)

Progress notes entered the following day (June 9th) confirm that, during the June 8th examination, Bowen complained of "increased pain around his right groin." (Doc. 72-1 at 14) The notes state that the "hernia is reducible with signs of incaceration [sic] or

5

strangulation."[3] It was also noted that Bowen was able to transfer himself in and out his wheelchair without assistance and that he "denies any other complaints besides hernia discomfort." (*Id.*)

On July 19, 2016, Bowen was examined by Dr. Tootle. The purpose of the visit was to update Bowen's medical records before an upcoming court date. Dr. Tootle noted the following (Doc. 72-1 at 13–14):

> [Bowen]'s primary medical issue is a large, painful recurrent right inguinal hernia. He says he was in prison with DOC at Lake Butler in late 2012 when he developed an incarcerated inguinal hernia on the right. He had bilateral inguinal hernias, that he feels came from a very bad cough he got after a flu shot in 2008. The right had gotten much larger than the left, and when the right became strangulated he was initially sent to the hospital at Lake Butler. He had bilateral hernia repair "where the [sic] sewed the inside and glued the outside." The left healed fine and remains no problem. The right didn't hold well, bulged out almost right after the surgery, and then became infected. He went back into the hospital with a large abscess, which ruptured and which caused sepsis. He was septic by the time he was sent to the Shand's hospital at Lake City, then transferred to Memorial Hospital in Jacksonville. He doesn't remember much of the first few days, but he had surgery by a midline abdominal incision to drain the abscess and resect a portion of bowel. They put a drain in the inguinal incision, did not do any further repair of the hernia itself. During that hospitalization, he developed renal failure, had "a heart attack from stress," and was on a ventilator for 9 days and a total hospital stay of 36 days.
>
> Since that time, the right inguinal hernia has gotten progressively worse. It hurts all the time, especially when he tries to walk. He has developed a balance problem and was walking with a cane for a while, but now primarily uses wheelchair because of the discomfort. He can stand, to shower or move to bed, but avoids walking more than few steps.
>
> His primary issue is that he would like to use his private insurance to get the hernia repaired. He knows that the repair is elective, but he has

---

[3] These medical notes appear to contain typographical errors. The word "incarceration" is misspelled. Additionally, it is unclear whether the author intended to write that the hernia was "*without* incarceration *or* strangulation" or "*with* incarceration *and* strangulation." The Court construes these notes in the light most favorable to Bowen. Nevertheless, these notes do not raise a genuine issue of material fact because, as explained in section III.A., Bowen's hernia was monitored regularly, and no medical provider determined that hernia repair surgery was medically necessary.

> Medicare and Humana and would like to petition the judge to have his surgery done with his own coverage, rather than continue wheelchair bound and in discomfort until release. He is quite concerned this could become strangulated again. He can't use hernia belt because it hurts his hips, and because it just doesn't hold in the hernia any longer. He says his bond is $212K, and he is going to ask the judge for bond reduction but, short of that, would like the judge to consider letting him get the hernia repair done with his own coverage.
>
> [T]he right inguinal hernia is photographed in this record, is about five inches and requires I stretch my hand as far as possible to encompass it, and still doesn't fit. Is [sic] mostly reducible, but not completely secondary to it's [sic] size.

Dr. Tootle noted that he explained to Bowen he would document the issue and his current findings, "but the remainder will be up to the judge." (*Id.*)

On July 20, 2016, Bowen was present in criminal court. (Doc. 71-1 at 2) Besides a handwritten note on a docket sheet that states "check defendant medically," the record is silent regarding the events of Bowen's court appearance that day (*Id.*)

On August 1, 2016, Bowen was seen by NaphCare medical providers for a Chronic Care Visit. (Doc. 72-1 at 72–77) The medical notes reflect that Bowen voiced no hernia-related complaints and denied abdominal pain. (*Id.* at 72)

On November 7, 2016, Bowen was examined again at a follow up Chronic Care Visit. (Doc. 72-1 at 79–85) At this visit, Bowen complained about his hernia, but reported that his hernia was "unchanged" and that he had "no pain." (*Id.* at 79–80) Upon examination, the hernia was "protruded, soft, non-tender to palpation, reducible" and "unchanged" since the last evaluation. (*Id.* at 81)

On December 11, 2016, Bowen submitted the following "Health Care Grievance" (Doc. 8 at 16):

> This is my third grievance concerning your failure to schedule me for a hernia operation (2-16-16 – 3-3-16). Dr. Kallman promised me that he would do this on or about May 25, 2016. He later quit or was fired. He was replaced by Dr. Tootle who also assured me that this would be

> done. She even e-mailed Judge Tharp who ordered her to do so. She too is now gone, quit/fired I don't know and don't care. I know that I have a serious medical condition that NaphCare has shown deliberate indifference to which said condition has reached [a] critical stage. Fourteen months is long enough to wait on NaphCare to perform their medical duties. Therefore, if I am not scheduled for surgery at Tpa. General/St. Joseph within 15 days, I shall cause to be filed in federal court a million dollar civil rights complaint against you.

On December 22, 2016, Bowen was examined again at a follow up Chronic Care Visit. (Doc. 72-1 at 87–91) The medical provider noted that Bowen presented with "no sign of acute distress" and that the hernia, upon examination was "easily reducible." (*Id.* at 87 and 89)

On February 13, 2017, Bowen was examined again. At this visit, Bowen requested hernia repair surgery and stated that the hernia belt was "no longer helping." (Doc. 72-1 at 94) The medical provider noted that Bowen showed "no sign of acute distress," and upon examination, the hernia was "mostly reducible, but not completely secondary to it's [sic] size." (*Id.* at 94 and 96) The provider also noted, "will place order for offsite general surgery for inguinal hernia repair" and "continue current plan of care." (*Id.* at 98)

On May 14, 2017, Bowen's medical chart was reviewed at the request of a Health Service Administrator. (Doc. 72-1 at 11) It was noted that, at Bowen's February 13, 2017 examination, the "[p]rovider recommended offsite general surgery for inguinal hernia repair—but did not submit." (*Id.*) It was further noted, "will initiate offsite request for General Surgery today, this will be reviewed and approved by Corporate." (*Id.*) Notes entered in Bowen's medical records on July 3, 2017 state "[o]ffsite referral initiated." (*Id.*)

On May 25, 2017, Bowen initiated this lawsuit. (Doc. 1) Approximately one month later, on June 29, 2017, Bowen began a preoperative evaluation and testing at Tampa General Hospital related to his hernia. (Doc. 72-1 at 103) At the initial preoperative evaluation, the surgeon diagnosed Bowen with a "ventral hernia without obstruction or gangrene." (*Id.* at

8

110) The surgeon ordered Bowen to "return for results after diagnostic testing" and "further surgical planning." (*Id.*)

On July 21, 2017, Bowen submitted to a CT scan of his abdomen at Tampa General Hospital. (Doc. 72-1 at 117) The CT scan showed a "right-sided fat and bowel containing inguinal hernia with no evidence of strangulation or bowel obstruction." (*Id.*) On July 31, 2017, a NaphCare medical provider reviewed the CT scan results and noted that Bowen was directed "to follow up with surgery to review CT abd (presumably, "abdominal") results/preop work up and cardiac clearance appt pending." (*Id.* at 9)

On July 28, 2017, Bowen was seen by a University of South Florida ("USF") cardiologist for a preoperative evaluation. (Doc. 72-1 at 119–25) The cardiologist noted the hernia was "reducible." (*Id.* at 123) It was further noted that Bowen "may proceed to planned procedure/surgery without further cardiac testing." (*Id.* at 124)

On September 14, 2017, Bowen was seen by a USF pulmonologist for a preoperative evaluation. (Doc. 72-1 at 127–30) The pulmonologist noted that the findings were "consistent with emphysema with pulmonary fibrosis," but there was "no absolute contraindication to proceed with planned surgery from a pulmonary standpoint." (*Id.* at 129) On September 29, 2017, a NaphCare medical provider reviewed the pulmonologist's findings. (*Id.* at 8)

On October 12, 2017, Bowen was again seen by the surgeon who noted that Bowen reported that the hernia "continue[d] to cause pain" and was "intermittently self-reducible." (Doc. 72-1 at 134) He advised Bowen that "given his past medical history, newly diagnosed emphysema/pulmonary fibrosis, increased DOE with cough and intermittent L chest pain the risks of undergoing elective hernia repair outweigh any benefits." (*Id.* at 134) The surgeon

9

noted there was "no evidence of bowel compromise, so repair of this complex hernia is purely elective." (*Id.* at 132)  He further noted he "would not offer [surgery] given other comorbid conditions." (*Id.*)

Publicly available records from the Florida Department of Corrections show that Bowen was released from custody on July 27, 2019.

## II.     Standard of Review

Summary judgment is appropriate when the movant can show that "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party.  *Fennell*, 559 F.3d at 1216.  A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320–21 (11th Cir. 2006) (citation omitted).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without

10

specific supporting facts have no probative value"). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

"*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999).

### III. Discussion

After the Court's prior rulings in this case (Docs. 5, 15, 28, and 90), these claims remain: (1) that the medical defendants were deliberately indifferent to Bowen's serious medical need for hernia repair surgery; (2) that Defendant NaphCare had a policy or custom of not approving his hernia surgery due to the cost; and (3) that the defendant physicians implemented the alleged policy. (Doc. 28 at 12–13)

#### A. Deliberate Indifference to a Serious Medical Need

A state has the constitutional obligation to provide adequate medical care—not mistake-free medical care—to those in confinement. *Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995); *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989). "Accidents, mistakes, negligence, and medical malpractice are not 'constitutional violations merely because the victim is a prisoner.'" *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Claims concerning the doctor's medical judgment, such as whether

the doctor should have used another form of medical treatment or a different diagnostic test, are inappropriate claims" in a civil rights action. *Wallace v. Hammontree*, 615 F. App'x 666, 667 (11th Cir. 2015).[4]

Instead, an inmate is protected from deliberate indifference to a serious medical need. "To prevail on a deliberate indifference to a serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). The medical need must be one that, if left unattended, poses a substantial risk of serious harm. *Farrow v. West.*, 320 F.3d 1235, 1243 (11th Cir. 2003).

If the plaintiff can establish that he had a serious medical need, he must then show that prison official acted with deliberate indifference to that need. *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990). Deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Lane v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016).

The medical defendants argue that this case represents a "classic case" of a disagreement about appropriate treatment because, although Bowen requested hernia repair surgery and intermittently complained of hernia pain, such surgery was not medically

---

[4] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

necessary. The defendants contend that the medical records show they did not ignore Bowen's complaints, but rather, provided appropriate medical care and treatment commensurate with Bowen's complaints and symptoms. They contend that Bowen's allegations, at most, state a claim for medical negligence, which is insufficient to establish deliberate indifference to a serious medical condition.

In response, Bowen emphasizes that this case "turns on the delay in providing medical care, not the types provided." He argues that the medical defendants deliberately delayed in providing him hernia repair surgery so long that, by the time he was examined by a surgeon his "emphysema [and] C.O.P.D. deteriorated to [the] point where surgery at [his] expense could be dangerous." (Doc. 100 at 7) He disputes the authenticity of their reason for not sending him to surgery, noting that although they stated his hernia was non-emergent, they also repeatedly warned him of the risks of strangulation of his hernia. He contends that he should not have to await a "tragic event" before seeking relief, particularly in light of his prior history of hernia strangulation. He argues that the medical defendants placed their own financial interests ahead of his medical needs.

This record reveals no genuine issue of material fact concerning whether the medical defendants' care constituted deliberate indifference to Bowen's serious medical needs. Upon Bowen's arrival at the Hillsborough County Jail, Bowen was examined and his hernia was identified. When he was examined again a month later, his hernia was found to be reducible and he was instructed to continue wearing his hernia belt. In February 2016, when Bowen first requested hernia repair surgery, he was reassured that hernia surgery was non-emergent and was encouraged to continue wearing the hernia belt and to avoid straining. In May 2016, when Bowen first complained of hernia pain, his hernia showed no signs of incarceration or

strangulation. In July 2016, Bowen continued to complain of hernia pain but, upon examination, it was mostly reducible, and Bowen acknowledged that he knew surgery was elective. By the end of 2016, Bowen continued to complain of hernia pain, but it was still found to be reducible. In February 2017, Bowen's hernia remained mostly reducible, but an offsite pre-operative evaluation for hernia repair surgery was ordered. Ultimately, the surgeon determined (albeit, after Bowen initiated this lawsuit) that, although the hernia continued to cause pain, there was no evidence of bowel compromise, so the surgery remained "purely elective."

There is no instance in the record in which a medical provider determined that hernia repair surgery was medically necessary. Bowen's hernia was monitored and evaluated regularly, and although he intermittently complained of hernia pain, the medical providers consistently determined that it remained reducible or intermittently reducible and non-emergent. This conclusion was consistent with the opinion of the surgeon who determined that the risks of undergoing "purely elective" hernia repair surgery outweighed the benefits of the surgery. Bowen's assertion that the defendants delayed so long that, by the time he was examined by a surgeon, his pulmonary health deteriorated to the point where surgery was too risky, lacks merit. Regardless of Bowen's pulmonary health, the surgeon found "no evidence of bowel compromise, so repair of this complex hernia is purely elective." On this record, the care Bowen received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *see also Williams v. Young*, 695 F. App'x 503 (11th Cir. 2017) (affirming the district court's finding of no deliberate indifference to the prisoner's need for hernia repair surgery, when the hernia remained treatable without immediate surgery).

The fact that Bowen believed he should have had surgery, or that he should have been sent for a preoperative evaluation earlier, is insufficient to support a deliberate indifference claim. This case is similar to *Palazon v. Sec'y, Fla. Dep't of Corr.*, 361 F. App'x 88 (11th Cir. 2010), in which a panel of the Eleventh Circuit affirmed summary judgment against a prisoner who claimed that the prison's delay in performing surgery on his inguinal hernia constituted deliberate indifference because the delay caused him greater pain than necessary. The medical records showed that the prisoner "saw doctors regularly and that his hernia remained reducible; and doctors did not want to operate on the hernia so long as it remained reducible." *Id*. at 89. The appellate court found that the care the prisoner received was "adequate and certainly not so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness." *Id.* (citations omitted). The fact that the prisoner "felt he should have had surgery earlier than he did [was] insufficient to support a deliberate indifference claim." *Id.*

Bowen also argues that the strain of getting up from the "boat" he was forced to sleep on while in an isolation cell caused his hernia to tear further, enlarging it from four inches to five inches. In a prior order, the Court found the following with regard to Bowen's placement in the isolation cell (Doc. 90 at 4) (citations omitted):

> [T]he evidence demonstrates that on May 25, 2016, Plaintiff completed a sick call request, complaining that he had suffered from diarrhea for approximately two weeks. Plaintiff was examined by Dr. Ball, who diagnosed persisted diarrhea and dehydration. Plaintiff was placed in medical isolation due to the possibility that he had contracted a contagious bacterial infection known as "c-diff."
>
> Therefore, Plaintiff was placed in isolation for medical reasons, not for punishment, and he was placed there by Dr. Ball, not Sgt. Hazel.

The record shows that during the time Bowen remained in medical isolation he was continually monitored, was in no acute distress, and was resting comfortably. Bowen

15

complained on May 31, 2016, that his hernia was causing him a lot of pain; but, upon examination, the hernia showed no signs of incarceration or strangulation. Bowen again reported increased pain in his right groin on June 8, 2016, but he did not show any signs of acute distress.

The record does not support Bowen's contention that the strain of getting up from the "boat" he was forced to sleep on while in an isolation cell caused his hernia to tear further. Although Bowen's hernia was measured at four inches on September 29, 2015 (before he was held in the isolation cell), and was measured at "about five inches" on July 19, 2016 (after he was held in the isolation cell), the record is devoid of any evidence that the change in size was caused by the strain of getting up from the "boat" in the isolation cell or that the increased sized was a result of isolation, which had long ended before the subsequent measurement was taken. To the contrary, the medical records show that Bowen was in no acute distress and was resting comfortably while in isolation. On one occasion, Bowen complained of back discomfort due to an "uncomfortable bunk," but there is no evidence of straining that caused his hernia to tear or enlarge. Bowen relies entirely on his own speculation and points to no evidence, medical or otherwise, on which a jury could reasonably find for him on this claim. Accordingly, summary judgment is appropriate.

### B.    Policy or Custom of Delaying Medical Care Due to Cost

Bowen also alleges that (1) that Defendant NaphCare had a policy or custom of not approving his hernia surgery due to the cost and (2) that the defendant physicians implemented the alleged policy. Liability of an administrator attaches if budgetary concerns dictate whether to provide necessary medical care. *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir. 1991) (The administrator "knew of the urgent need for proper personnel to treat Howell.

His apparent decision not to pursue such personnel and allow the 'budgetary process' to determine whether Howell would receive necessary treatment could be found to be deliberate indifference under *Estelle*'s prohibition of delays in obtaining treatment.")  Moreover, the existence of a policy or custom can attach liability to the entity responsible for creating the policy or custom, as *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007), explains:

> "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986).

*See also Buckner v. Toro*, 116 F.3d 450, 452–53 (11th Cir. 1997) (concluding that a private entity providing medical care to inmates may be directly liable under § 1983 if the action alleged to be unconstitutional is undertaken pursuant to that entity's policy or custom).

No evidence in the record supports Bowen's assertion that NaphCare had a policy or custom of not approving surgery due to cost, or that the medical providers implemented such policy.  NaphCare's Utilization Management Manual states that medical reasons may exist for not approving hernia repair in the jail setting but that, when there are medical signs that surgery may be indicated, a referral can be submitted.  The Manual states the following regarding hernia repair surgery (Doc. 80-14 at 11):

> Routine hernia repair surgery is not typically approved in a jail setting.  Because of the risk of infection, length of recovery, and rehabilitation time needed, this type of routine elective surgery is better reserved until after release.  Most hernias are reducible and can be managed onsite with a simple hernia belt.  Educate patients on the importance of limiting or avoiding activities that aggravate the affected area such as straining and heavy lifting.  If the patient is experiencing bladder or bowel issues, or there is concern for incarceration or strangulation, surgery may be indicated and a referral can be submitted.

Nothing in the Manual—or anything else in the record—raises a genuine issue of material fact concerning whether NaphCare had a policy or custom of considering cost when determining the manner and type of care to be provided.

In regard to his assertion that NaphCare delayed in providing him hernia repair surgery due to cost, Bowen points to no evidence, and instead relies only on his speculation, that cost played a role in his medical care. "[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citations and alterations omitted). Accordingly, summary judgment is appropriate on this claim.

### IV.    Bowen's Motion to Strike

Also before the Court is Bowen's "Motion to Strike Defendants' Response to Plaintiff's Opposition to All Defendants' Motions for Final Summary Judgment and or Dismissal." (Doc. 102) The title and the timing of the motion suggest that Bowen is moving to strike Defendants' reply (Doc. 84) to his response (Doc. 81) to their previously-filed summary judgment motion (Doc. 70).[5] However, Defendants' previously-filed summary judgment motion was denied without prejudice (Doc. 87), and that reply is no longer at issue. Therefore, to the extent that Bowen moves to strike Defendants' inoperative reply (Doc. 84), the motion is **DENIED AS MOOT**.

---

[5] Bowen is not moving to strike the reply to the summary judgment motion now before the Court because he moved to strike on December 10, 2020, before—not after—Defendants replied on December 23, 2020.

In the body of his motion to strike, Bowen contends that the medical defendants failed to produce all contracts between NaphCare Medical and the Hillsborough County Sheriff's Office, despite his repeated requests. Nevertheless, Bowen admits that he "finally obtained a copy of said contract on or about 10-5-2020." He argues that Defendants' discovery violation was intentional, prejudicial, deceptive, and wasted the Court's resources.

Defendants respond that Bowen never requested such contracts. They further state that they "did not provide any discovery to [Bowen] as the discovery cut off . . . was January 6, 2020." (Doc. 104 at 3) The Court interprets this statement to mean that Bowen obtained the contract not from Defendants, but from some other unidentified source.

To the extent that Bowen moves to strike the contract as a penalty for Defendants' failure to produce it, the motion is denied. Bowen was not prejudiced because, regardless of the source of the contract, he admittedly obtained it on or about October 5, 2020—two months before he filed his opposition to the summary judgment motion on December 10, 2020. And, Bowen did, in fact, file the "Health Services Agreement" between NaphCare Medical and the Hillsborough County Sheriff's Office as an exhibit to his opposition to the summary judgment motion, which the Court has considered. (Doc. 100-2 at 1–13) Nothing in that contract raises a genuine issue of material fact concerning Bowen's allegations. Furthermore, Defendants did not file, and do not rely on, the contract in their summary judgment motion or reply. Therefore, Bowen's Motion to Strike (Doc. 102) is **DENIED**.

**V.    Conclusion**

Defendants' Motion for Summary Judgment (Doc. 88) is **GRANTED**. The Clerk is directed to enter final judgment in favor of the medical defendants, including Defendants NaphCare Medical, Dr. Frederico Kallman, Dr. Kristin Ball, and Dr. Karen Tootle. The

19

Clerk is also directed to enter final judgment in favor of Defendant Sergeant Kim Hazel, pursuant to the Court's prior order granting summary judgment in her favor. (Doc. 90) All of Bowen's claims against all defendants have been resolved; therefore, the Clerk is directed to **CLOSE** this case.

Done and ordered in Tampa, this 16th day of February, 2021.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE